OPINION OF THE COURT
Joyce L. Sparrow, J.
This court has pending before it a petition alleging that both parents abused their child, Bruce, Jr.
This young couple (the mother is now only 22 years old) has had five natural children (two were twins) in four years, only one of whom survives today. The four deceased children did *758 not live beyond the age of four months. The surviving child, Bruce, Jr., was removed from his parents’ care after Jason (his twin) died and is currently thriving in a foster home.
The unique issue before this court is whether the respondents have displayed such a reckless disregard for appropriate care of these children that their actions posed a substantial risk of death to the remaining child, Bruce, Jr. No specific allegations of physical abuse are alleged or presented.
Petitioner called as witnesses both Dr. Sheela Laungani, the physician in charge of the only infant apnea clinic in Brooklyn, and Lorraine Marino, a registered nurse and coordinator of this clinic, the Infant Apnea Program at Downstate Medical Center. Both are experts in the field of Apnea and Sudden Infant Death Syndrome (SIDS), as well as having direct contact with the family in question, since the respondents were referred to the clinic regarding the third child (Erin), and the twins (Bruce, Jr. and Jason).
Infant apnea was described as a tendency to stop breathing without etiology. SIDS is apparently one of the leading causes of death in young infants. Dr. Laungani testified that the definition of SIDS (as accepted by the Second International Conference nearly 20 years ago, and not changed in definition since) is the sudden death of any infant or young child that is unexpected by history and in which a thorough postmortem examination fails to demonstrate an adequate cause. Certain children are at high risk, but Dr. Laungani stated that she considered the important factor, in this family, the prior sibling deaths. She further testified that it is extremely rare for there to be multiple deaths from SIDS in one family, but she has personally never seen it.
When an infant seems at high risk for SIDS, most experts prescribe an apnea monitor, which records breathing and heart rates through a belt with electrodes which is attached to the infant. The monitor serves only to alert parents (with a beeping alarm) to dangerous variations in these vital signs, but does not, itself, resuscitate the child. According to Dr. Laungani, the monitors are considered state of the art with no true alternatives. Monitors are to be used anytime babies are asleep, or alone, so that parents need not personally monitor. The monitor cannot harm an infant, but can serve as a lifesaving alarm to parents.
The mother was 17 years old when she gave birth to her first child, Kristen. The baby’s birth was normal but she lost *759 her life to what the Medical Examiner described as acute cardiac arrest, acute congestive heart failure and acute bronchopneumonia, when she was under two months old. After Kristen’s death, the parents and the maternal grandparents were referred to and attended, for a brief time, individual and group SIDS counseling. Apnea monitors were only discussed in passing. Kristen died upstate and the father was not present.
Heather was born about two years later. She was released a well baby but was rehospitalized with an apnea disorder within three weeks of her birth. An apnea monitor and training was then provided to respondents by Maimonides Hospital. Unfortunately, Heather died within a day and a half of her second release from the hospital to respondents. Although the respondents both testified to use of the monitor, aspects of their description do not conform to the expert testimony and lacked veracity. The parents vehemently opposed an autopsy and were already unaccountably hostile to the medical profession.
Heather’s death was attributed to SIDS, although no autopsy was performed. Dr. Laungani testified credibly that a diagnosis of SIDS can be made only after a gross and microscopic, histological examination of organs. The doctor further stated that it takes time, at least minutes, for a baby to turn blue. This contradicts the mother’s testimony that she immediately attended to Heather upon hearing the monitor alarm, and found the baby blue and not breathing.
Erin was a borderline preterm baby, born 16 months after Heather. Erin was born with tremors and was diagnosed as having drug withdrawal symptoms. The medical records reveal that both the mother and father were more than casually involved with drugs. Two weeks after her birth Erin was released from the hospital despite being on a hospital hold because of the suspicions regarding her parents’ drug use. After Erin’s release from the hospital the family was referred to the Infant Apnea Clinic at Downstate Medical Center. Dr. Laungani prescribed an apnea monitor and regular follow-up visits at the clinic. The family was referred to Paramedical Specialties, Inc. (PSI), the company who supplied the monitors, and Stacey Weber, a nurse with PSI, again instructed both the mother and grandmother in its use. On November 13, 1986, Erin was hospitalized in Methodist Hospital due to a "seizure disorder”. Five days later, Erin was released back to her mother’s care. In January 1987 the mother admitted to Ms. *760 Weber that she had not monitored Erin for the last month because she felt it unnecessary. The mother also admitted to missing all follow-up appointments at the clinic.
Unfortunately, the saga continued, and on February 9, 1987 Erin died. The mother told multiple unbelievable stories to various people about Erin’s death, which at the very least contradict her stated use of the monitor. Initially, Erin’s cause of death was listed as SIDS. On November 30, 1987, however, that determination was changed to Sudden Unexplained Death — Circumstances Undetermined. Dr. Laungani explained that this change can be attributed to the Medical Examiner’s investigation, beyond a physical autopsy, into both environmental and psychosocial influences.
On August 2, 1987, less than one year after Erin’s birth, the mother delivered twin boys, Jason and Bruce, Jr., by Caesarean section at Methodist Hospital. They were born borderline premature and kept in the hospital for almost three weeks, since again there was a Special Services for Children (SSC) hold, because SSC had received anonymous reports that the mother was killing her children for insurance money to sustain her drug habit. In April 1987, while five months pregnant with the twins, the mother told Ms. Weber that she planned never to use the monitors again. Official discharge instructions provided to the parents specifically referred the family to the Downstate Apnea Clinic and stated that home apnea monitors were to be in place. The babies were released to the parents on August 24, 1987. Ms. Perez, an SSC caseworker, repeatedly met with the family and requested proper monitoring of the twins but apparently was ignored. Additionally, Ms. Perez offered to provide a homemaker to assist the mother, but was refused.
On September 8, 1987 the mother, the maternal grandmother and the twins visited the Downstate Apnea Clinic for a medical evaluation by Dr. Laungani. The mother expressed her intention to discontinue use of the monitor though the doctor strongly warned against this because of the deaths of three prior siblings. The mother’s behavior at the clinic was unaccountably hostile and difficult. She argued with Ms. Marino, failed to register properly and left without getting followup appointment dates. However, Ms. Marino subsequently mailed two appointment slips (one for each twin) to the mother. The appointment was not kept and on October 6, 1987 the clinic filed with SSC a report of child abuse regarding the missed clinic appointment. Mr. Paris, a new SSC caseworker *761 assigned to this case, immediately investigated, but accepted the mother’s explanation. Mr. Paris’ next visit was on October 13, 1987, at the mother’s home. He never checked the mother’s story about the missed clinic appointment, and he was operating under the mistaken belief that the mother’s explanation for the missed October 6 clinic appointment was true. The mother told him that she was only monitoring the babies at night, not during the daytime, and Mr. Paris again warned the mother that nonuse of the monitors would result in court involvement.
Jason died on October 17, 1987 with both parents present, and the cause of death was attributed to Sudden Unexplained Death — Circumstances Undetermined. No physical findings were reported to explain this baby’s demise and the parents once again provided inconsistent and incredible descriptions of his death. On October 19, 1987 SSC removed Bruce, Jr. from the family’s custody.
The cumulative weight of all the evidence indicates that these parents have failed repeatedly to follow medical advice, have missed necessary medical appointments and have repeatedly lied both to this court, SSC and the doctors about their actions; particularly about their use of the apnea monitors, their actions in the care of these children during critical situations, the missed clinic appointments and their drug use. Their entire attitude towards medical assistance for their children was and continues to be extremely hostile, inappropriate and never satisfactorily explained.
The statute is clear that physical injury need not exist for a finding of abuse. If the parent "creates * * * a substantial risk” of such a physical injury which "would be likely to cause death or serious * * * physical or emotional * * * impairment[s]”, a child may be considered abused. (Family Ct Act § 1012 [e] [ii].) At least one court has even found sufficient for a finding of abuse, protracted impairment of emotional health, or a substantial risk thereof. It is the potential impact that must be assessed. (Matter of Shane T., 115 Misc 2d 161.) The less involved parent may also be responsible for abuse if s/he "allows to be inflicted” or creates "the risk of * * * injury”. (Family Ct Act § 1012 [e] [i], [ii]; Matter of Alyne E., 113 Misc 2d 307.) This is particularly true if the objective evidence proves that it should have prompted adequate protective measures. (Matter of Katherine C., 122 Misc 2d 276.)
Additionally, if the evidence tends to prove that abuse of *762 one child is very proximate in time to another child, such that the condition still exists, this in and of itself may indicate abuse of the second child. (Family Ct Act § 1046 [a] [i]; Matter of Cruz, 121 AD2d 901.) Family Court Act § 1046 (a) (ii) further states: "[P]roof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent * * * shall be prima facie evidence of child abuse * * * of the parent” (emphasis added).
It is apparent to this court that the behavior of these parents placed all of their children in substantial danger of death, and four did in fact die. It is this court’s opinion that the parents have evidenced, at the very least, gross negligence in the care of their children such that their actions rise to the level of abuse. Their own explanation for their actions are unsatisfactory.
Accordingly, the court finds that the petitioner has sustained its burden of proof by a preponderance of the evidence and enters a finding of abuse as to both respondents regarding the surviving child, Bruce, Jr.
Respondents are directed to appear for a mental health study at the Family Court Mental Health Clinic, 5th floor, on May 16, 1988 at 9:00 a.m. The respondents are further directed to appear for a dispositional hearing on May 27, 1988. Counsel for respondents shall advise his clients of these appointments.